**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | | |
|---|---|---|
| AMBER RASMUSSEN AND | ) | |
| BETTY IRVIN, Both individually, | ) | |
| and on behalf of a class of | ) | |
| all persons similarly situated | ) | |
| | ) | CASE NO. 3:20-CV-107-CHB |
| PLAINTIFFS | ) | ***Electronically filed*** |
| | ) | |
| vs. | ) | |
| | ) | |
| STATE FARM MUTUAL AUTOMOBILE | ) | |
| INSURANCE COMPANY, SARAH WEIR AND | ) | |
| DEBORAH COMBS | ) | |
| | ) | |
| DEFENDANTS | ) | |

<u>**PLAINTIFFS' AMENDED COMPLAINT, CLASS ACTION COMPLAINT,**</u>
<u>**AND DECLARATORY JUDGMENT ACTION**</u>

Come the Plaintiffs, Amber Rasmussen and Betty Irvin, by counsel, and for their Amended Complaint, Class Action Complaint and Declaratory Judgment Action and causes of action against State Farm Mutual Automobile Insurance Company, Sarah Weir, and Deborah Combs, state as follows:

1.      Plaintiffs incorporate by reference as though fully set out herein the allegations, facts, claims and statement contained in their original Complaint that are not inconsistent with the allegations, facts, claims, and statements contained herein. Fed.R.Civ.P. 10(c).

## AMBER RASMUSSEN BACKGROUND FACTS

2.      Amber Rasmussen is a single mother of two.  One of her children is special needs.

3.      Prior to the collision of October 22, 2018 Amber had never been involved in a collision.

4.      On October 22, 2018, Defendant Sarah Weir, was traveling westbound on Data Vault Drive, towards its intersection with Aiken Road, in Jefferson County, Kentucky. As Defendant Weir approached the intersection, she failed to yield the right-of-way to the vehicles traveling on Aiken Road resulting in a collision with the vehicle in which Amber Rasmussen was a restrained driver.  There is nothing Amber could do to avoid the collision. A copy of the Louisville Metro Collision report is attached as Exhibit 1.

5.      At the time of the collision both Amber and Defendant Weir were insured by Defendant State Farm Mutual Automobile Insurance Company (Hereinafter "State Farm").

6.      Amber paid approximately $1,800 per year for her State Farm policy to insure her leased Subaru. Over $500 of that premium is for collision coverage required by her lessor, and rental car coverage.  (Auto renewal and declarations page attached as Exhibit 2).

7.     The first page of Amber Rasmussen's Auto Renewal page from State Farm prominently displays this:



8.     Immediately following the collision, Amber needed help.  She was suffering from a panic attack and was sore and shaky.  The 33-year Amber had never been in a car wreck previously and was not sure what to do.  She called her State Farm agent within an hour to get her car fixed.  Amber's State Farm agent referred her to a phone number to set up a first party collision claim.  Amber called the number given to her by her agent, received the first party collision claim #176226W6801, and was told by State Farm she could take her vehicle anywhere she liked to get it repaired and have

an estimate performed.  Amber chose to take her vehicle to the Bachman Subaru dealership.

9.      While at Bachman Subaru on October 22, 2018, a State Farm collision adjuster called her to say Amber could open a claim under her collision coverage on her own policy to get her car fixed right now, and she would have a $500 deductible, or she could wait and file a claim with the at fault party's insurance.  State Farm's inspector had classified her Subaru as not drivable because of the damage from the collision. Amber told State Farm that she needed her car fixed now, and to use her collision coverage. Amber can document several different conversations with a State Farm adjuster on October 22, 2018, plus conversations with her agent, with a total conversation time of twenty-seven (27) minutes.

10.     On October 24, 2018, Amber called State Farm because Bachman Subaru told her that State Farm was not going to pay for parts sufficient to restore the Subaru to its pre-loss condition.  The State Farm adjuster on Amber's first party collision claim confirmed that State Farm would not pay for parts sufficient to restore the Subaru to its pre-loss condition, which is what the policy requires. Amber talked to Subaru to see if new parts were required by her lease agreement and was told yes.  Amber then called State Farm back and told State Farm what Bachman Subaru said.  When she told State Farm this, State Farm told Amber that if she needed parts sufficient to restore the

Subaru to its pre-loss condition, she would have to pay the difference in price between the new parts and the reconditioned/recycled/used parts.

11.    Later that same day State Farm told Amber she needed to get State Farm a copy of the collision report to expedite her first party collision claim.  Within hours, Amber provided a police report to State Farm. Amber has complied with every proof of claim State Farm has asked of her.

12.    On October 24, 2018 Amber's State Farm collision adjuster told her that Defendant Weir too is covered by a State Farm policy.  Amber again expressed her disappointment that State Farm would not pay for parts sufficient to restore the Subaru to its pre-loss condition and was making her pay out of pocket.  The State Farm first party collision adjuster stated that he would not increase the collision offer to cover the cost of parts sufficient to restore the Subaru to its pre-loss condition, but he could get her an additional $1,000 in the form of pain and suffering damages to cover the costs of parts needed to restore the Subaru to its pre-loss condition.  Feeling under duress, Amber said fine. During this conversation Amber's State Farm first party collision adjuster openly changed roles and became an adversarial State Farm third-party liability claim adjuster, antagonistic to Amber's needs and claims, to advocate on behalf of Defendant Weir.  The State Farm adjuster told her he voided the first party collision coverage claim number, was assigning a new claim number for a third-party liability

claim, claim#176266Q54, and then proceeded to record what State Farm purports to be an "injury release".

13.     The purported "injury release" does not mention Amber's future medical expenses, mental anguish, inconvenience, property damage, future pain and suffering, rental reimbursement, permanent injury and impairment, or lost wages. The purported "injury release" a does not release **State Farm** and does not include any indemnity or hold harmless language.  A copy of the alleged transcript of the so-called injury release is attached as Exhibit 3.

14.     State Farm mailed a check to Amber Rasmussen in the amount of $1,000.00 that same day.  The remarks on the check stub read "1000.00 for P&S F&F excl of D/W PIP" which is all the writing provided about the payment.  The check was not accompanied by a statement setting forth under which coverage the payment was being made. A copy of the check and stub is attached as Exhibit 4.

15.     On October 24, 2018 Amber Rasmussen and State Farm participated in approximately eight different conversations which totaled approximately one hour and eighteen minutes of conversation time.   State Farm has refused to produce copies of the audio or transcripts of all the conversation between State Farm and Amber Rasmussen.

16.    State Farm and Amber did not discuss settlement of Amber's future medical expenses, mental anguish, inconvenience, property damage, future pain and suffering, rental reimbursement, permanent injury and impairment,  or  lost wages. State Farm did not investigate Amber's physical or mental injuries, her need for medical treatment, her lost wages, or permanent injury. State Farm never told Amber her policy required State Farm to restore the Subaru to its pre-loss condition. Amber's collision claim remains unpaid.

17.    State Farm's damage estimate shows the first-party collision claim number #176226W6801 and not the third-party property damage liability claim number #176266Q54 State Farm says it changed it to.  State Farm damage estimate attached as Exhibit 5.

18.    The total cost to repair the Subaru to its pre-loss condition is $4,875.79. State Farm paid $4,495.48 to Bachman Subaru, leaving $380.31 that Amber paid out of her pocket.  A copy of the Bachman receipt is attached as Exhibit 6.

19.    On October 25, 2018, Amber began treating for mid-back pain, neck pain and upper back pain and headaches she was experiencing as a result of the collision. Amber was diagnosed with pain in the thoracic spine, cervicalgia, segmental and somatic dysfunction of the thoracic region, and segmental and somatic dysfunction of the

cervical region.   Amber treated for over three months and incurred in excess of $9,000.00 in medical expenses related to the collision and is still treating to this day.

20.     On October 29, 2018 Amber retained counsel because she felt she had not been treated fairly by State Farm. On November 7, 2018, by counsel, Amber returned the $1,000.00 to State Farm, and advised that she had not settled her tort claims and Amber declined the offer and was still treating for her injuries sustained in the collision. Letter attached as Exhibit 7.

21.     On November 13, 2018, Libby Hopple at State Farm contacted Plaintiff's counsel by letter advising of the availability of first party underinsured motorists coverage (UIM), and requested information to evaluate the UIM claim as the first party UIM claims adjuster.  The claim number on the letter is the same claim number given when Amber set up her first party collision claim.  Letter attached as Exhibit 8.

22.     By November 16, 2018, Libby Hopple at State Farm had changed roles and became the State Farm third-party liability claim adjuster.  A letter from Ms. Hopple has the third party liability claim listed, and denied Amber Rasmussen's tort claims against Defendant Weir on the basis that "Ms. Rasmussen completed a recorded release on October 24, 2018 wherein she agreed to settle the bodily injury claim for $1,000.00." and provided the purported transcription of the conversation.  Letter attached as Exhibit 9.

23.    On December 28, 2018, Amber, by counsel, requested that State Farm provide copies of all and transcripts of conversations with Amber Rasmussen, a list of conversations not recorded, in addition to advising State Farm that the burden was on it to prove the existence of a valid, enforceable contract.  Email attached as Exhibit 10.

24.    806 KAR 12:095(5)(3)  requires State Farm to make an appropriate reply to that correspondence within fifteen (15) days. State Farm did not reply until February 14, 2019 and continued to deny the claim.

25.    On July 26, 2019 a settlement demand packet for Amber's tort claims was sent to State Farm.

26.    On August 2, 2019 State Farm again denied the tort claim, citing the purported "injury release."

27.    On October 8, 2019 Amber again requested copies of all recorded conversations between State Farm and Amber and a list of recorded conversations.

28.     State Farm did not reply to the October 8, 2019 until November 22, 2019 at which time State Farm alleged it did not have any other recordings.

29.    State Farm argues that Amber's tort claims for medical expenses, mental anguish, inconvenience, property damage, future pain and suffering, rental reimbursement, permanent injury and impairment, and lost wages (hereinafter

cumulatively referred to as tort claims) were settled for $1,000.00 two days after the collision.

30.     The estimated range of a jury verdict for Amber's tort claims is $18,454 to $26,573. See report from Shannon Ragland, founder of Kentucky Trial Court Review, attached as Exhibit 11. This evaluation is separate from Amber's property damage and loss of use claims. State Farm pressured Amber when she was under duress, refusing to pay her the full compensation on her first party collision claim required by the policy. State Farm argues Amber's third-party property damage and tort claims settled for two separate payments of $4495.48 and $1000, leaving her with $8,227 to $16,346 in uncompensated tort damages. State Farm has failed to pay Amber's first party collision coverage in the amount of $4,875.79.

**BETTY IRVIN BACKGROUND FACTS**

31.     Betty Irvin was born in Leslie County, Kentucky, and she lived there until moving to Louisville where her husband found a job at GE after working in the coal mines. Betty and her husband moved to Bullitt County in 1970 where she now resides.

32.     Betty has minimal income and made ends meet prior to the collision through income from babysitting her grandchildren.

33.     Betty is hearing impaired and has been for many years.

34.     Betty was hearing impaired at the time of the collision on June 5, 2018.

35.    Betty's hearing impairment makes it difficult for her to hear during normal conversation and makes it very difficult for her to hear conversations on the phone.

36.    The collision on June 5, 2018 was Betty's first motor vehicle collision in her life.

37.    At the time of the collision, and now, Betty is a Medicare recipient and had a Medicare Advantage plan through Humana.

38.    On June 5, 2018, Defendant Deborah Combs, was traveling on Havenview Drive in Jefferson County, Kentucky. Defendant Combs failed to yield the right of way and pulled from an inferior roadway colliding with the  passenger side of Betty Irvin's vehicle. Betty was a 72-year-old restrained driver who was traveling on Bardstown Road. The impact caused Betty's vehicle to  spin and up on to two wheels.  A copy of the collision report is attached as Exhibit 12.

39.    Betty immediately began to suffer from pain in her right arm, her neck, her right elbow, and her right wrist.  She sought medical treatment that same day and was diagnosed with elbow pain, neck pain,  hand strain, muscle strain, and a contusion.

40.    That night, Betty spoke by phone with State Farm, the insurance company for Defendant Combs, about fixing her car.  Due to her hearing impairment Betty did not hear or understand what was said except  State Farm recommended she take her vehicle to Glaser's Collision Center of Bullitt County.

41.     On June 6, 2018, the morning after the wreck, Betty took her car to Glaser's.  Not long after arriving at Glaser's, State Farm called her.  She did not hear or understand the State Farm adjuster due to her hearing impairment.  She told the State Farm adjuster that she could not talk right then because she was with a body shop worker looking at her car.

42.     After the body shop looked at Betty's car the body shop worker told her it was a total loss.

43.     A State Farm adjuster called again while Betty was still at Glaser's.  Due to her hearing impairment she did not hear or understand the State Farm adjuster. She told State Farm that the body shop said her car was a total loss and that she was supposed to be leaving on vacation with her family in two days and really needed a vehicle.  The State Farm adjuster told her that she would send her a check for $1,500.00 for her "inconvenience" and get her in a rental car for a week.  She remembers the State Farm adjuster asking to record part of the conversation.  She did not hear or understand State Farm. If the State Farm adjuster ever asked her if she was injured, if she had gotten any medical treatment, if she needed medical treatment, what her injuries were, if she was in pain, or if she suffered any lost wages  she did not hear it.  She got a check from State Farm a few days later for $1,530.00 and cashed it.  It was Betty's understanding it was  money for her inconvenience of not having a car.  A copy of the check is attached

as Exhibit 13. Betty never had a conversation that she knows of with State Farm that discussed or settled her claims for future medical expenses, mental anguish, inconvenience, pain-and-suffering, future pain and suffering,  permanent injury and impairment,  or  lost wages.  Betty never signed a document settling these claims. Deborah Combs and State Farm's defenses of settlement or accord and satisfaction of these claims is false. State Farm never investigated her claims for medical expenses, mental anguish, inconvenience, pain-and-suffering, future pain and suffering, permanent injury and impairment,  or  lost wages

44.    Approximately four days later State Farm called Betty Irvin while she was on vacation with her family.  Again Betty was having difficulty hearing what the State Farm adjuster said, but heard State Farm had deemed her vehicle a total loss, there would be a check waiting for her at a local State Farm office when she returned from vacation, and that she needed to get back from vacation now to get her personal effects from the vehicle otherwise Betty was going to be responsible for storage fees.  Betty cut her vacation short in order  not to incur storage fees and because she was in a lot of pain from the injuries she suffered in the collision.

45.    Betty had collision coverage with Kentucky Farm Bureau that would have paid for the damage to her car, less the deductible.  A copy of her declarations page is attached as Exhibit 14.

46.     By October 17, 2018, Betty's Kentucky Farm Bureau basic reparations no fault coverage was exhausted at which point her Medicare Advantage plan began paying for her medical treatment, leaving her responsible for co-pays, which she has paid.

47.     On December 13, 2018 Betty retained counsel and on December 18, 2018 Betty, by counsel, placed State Farm on notice of her tort claims against State Farm's insured Deborah Combs.

48.     State Farm acknowledged the representation and Betty's notice of claim on December 19, 2018.

49.     On February 4, 2019 State Farm sent Betty's counsel a letter stating, "we settled with your client and obtained a release on June 6th, 2018." See letter attached as Exhibit 15.

50.     On February 5, 2019 Betty requested that State Farm preserve and provide numerous documents and things including the purported release.  See letter attached as Exhibit 16.   All the requested items have not been produced.

51.     On February 11, 2019 State Farm provided an alleged transcript of a portion of one of State Farm's conversations with Betty Irvin.  At the top of the transcript it states, "Transcriptionist's note:  Due to poor recording quality, there are many inaudibles throughout the transcript."  A copy of the alleged transcript is attached as Exhibit 17.

52.    On August 30, 2019 Plaintiff Irvin, by counsel, again requested that State Farm provide the items requested in the February 5, 2019, including the actual recordings of conversations with Plaintiff Irvin. Copy of letter attached as Exhibit 18.

53.    Despite the requirements of 806 KAR 12:095(5)(3) that require State Farm to make an appropriate reply within fifteen (15) days, State Farm did not respond to the August 30, 2019 request until October 24, 2019, at which time State Farm provided only a recording of approximately 1 minute and 45 seconds of one of the phone conversations Betty Irvin had with State Farm.  State Farm refuses to provide any other documentation or recordings and again denied Betty's tort claims.

54.    On October 31, 2019 Betty sent State Farm a demand letter with accompanying documentation, which documented her injuries suffered in the collision, and $26,221.77 in medical expenses related to treatment for injuries suffered in this collision.  In the demand, Plaintiff again requested copies of all recordings of conversations with Betty Irvin.

55.    Despite the requirements of 806 KAR 12:095(5)(3) that require State Farm to make an appropriate reply within fifteen (15) days, State Farm did not respond to the October 31, 2019 demand and request until December 13, 2019, at which time State Farm advised it considered Betty's claims settled.

56.    The estimated range of a jury verdict for Betty's tort claims is $53,822 to $76,896. See report from Shannon Ragland found her of Kentucky Trial Court Review attached as Exhibit 11. This means that Betty has $42,292 to $65,366 in uncompensated tort damages.

## CLASS ACTION FACTS

57.    In addition to the allegations of Plaintiffs' original complaint, in its notice of removal State Farm stipulates numerosity, and probably typicality too. (Document 1 p. 6 ¶21).

## COUNT I

58.    On October 22, 2018 Defendant Weir negligently and carelessly operated a motor vehicle so as to cause it to collide with the motor vehicle Plaintiff Rasmussen was driving in Jefferson County Kentucky.

59.    As a result of the negligence and carelessness of Sarah Weir, Plaintiff Amber Rasmussen has been caused to incur medical expenses in excess of $9,000.00, and she will be caused to incur medical expenses in the future. Amber Rasmussen has lost wages, and she is permanently injured so that her power to labor and earn money is permanently impaired. Amber Rasmussen has endured physical and mental pain and suffering, inconvenience and mental anguish as a result of the collision, and she will be

caused to endure physical and mental pain-and-suffering, inconvenience and mental anguish in the future as a result of the collision.

## COUNT II

60.    As a result of the negligence and carelessness of Sarah Weir, Amber Rasmussen's automobile was damaged causing her to incur out of pocket expense to repair the vehicle, causing the value of the vehicle to diminish, and causing her to have loss of use of the vehicle.

## COUNT III

61.    Plaintiff Amber Rasmussen prays for a declaratory judgment pursuant to 28 U.S.C. §2201(a), the Declaratory Judgment Act, that her first party collision claim and her tort claims, including claims for medical expenses, pain-and-suffering, lost wages, inconvenience, mental anguish, permanent injury and impairment of her power to labor and earn money, property damage and loss of use claims against State Farm and Sarah Weir are not released, and there is no release contract or accord and satisfaction of those claims.

62.    An oral release is a type of contract, subject to all defenses to a contract.

63.    Based upon the facts as pled herein there is no release contract, oral or written, because the purported "injury release" is missing essential elements of a contract including a clear offer, acceptance, mutual assent, full and complete terms,

mutuality of obligation, the undue influence and duress State Farm placed upon Amber, the lack of intent of the parties, lack of consideration, State Farm's failure to extend the utmost good faith to Amber, and failure of consideration.

64.     Any purported settlement agreement with Defendant Weir was sought by Defendant Weir's agent, State Farm, through means that violate KRS 304.12-230, The Unfair Claims Settlement Practices Act, and is therefore void or voidable as against public policy and the law.

65.     "'[D]ay after the accident' settlements are not looked upon with favor by the courts." McGregor v. Mills, 280 S.W.2d 161, 162 (Ky.App. 1955); See also Topass v. Perkins' Adm'x, 104 S.W.2d 423, 431 (Ky.App. 1937).  Any purported "injury release" Amber purportedly entered into two days after the collision is void as contrary to public policy.

66.     Oral settlements are only enforceable if the requirements of a contract are met which includes the requirement of "full and complete terms" which are nonexistent for the reasons stated. Cantrell Supply, Inc. v. Liberty Mut. Ins. Co., 94 S.W.3d 381, 384 (Ky.App. 2014).

67.     Amber's purported "injury release" does not contain full and complete terms.  The purported "injury release" does not address her tort claims for future pain and suffering, mental anguish, inconvenience, future medical expenses, impairment of

the power to labor and earn money, future lost wages, loss of use, diminished value of the vehicle, property damage, or injuries which have resulted or may result in the future or state those claims are released.  The purported "injury release" also does not release State Farm for first party and third-party bad faith.  State Farm noted multiple parts of the alleged transcript of the purported oral release as "inaudible."  An exemplar written State Farm release is attached as Exhibit 19 which shows what State Farm has traditionally demanded as full and complete terms on other cases for over a generation.

68.    The purported "injury release" also lacks the formal and traditional requisites of a release contract in general, in particular the missing elements of: Plaintiff's signature, mutual assent, mutuality of obligation, lack of intent of the parties, lack of an offer and acceptance in general, lack of consideration, and failure of consideration.  Nothing in the alleged transcript provided by State Farm shows Amber agreed to release any claims for future pain and suffering, mental anguish, inconvenience, future medical expenses, impairment of the power to labor and earn money, future lost wages, loss of use, diminished value of the vehicle, property damage, or injuries which have resulted or may result in the future. Amber did not intend or agree to release those claims.

69.    State Farm is required to exercise the utmost good faith in dealing with its policyholder Amber Rasmussen and has failed to do so. Terrell v. Western Casualty and

<u>Surety Co.</u>, 427 S.W.2d 825 (Ky.App. 1968).  State Farm's failure to act with the utmost faith while attempting to effectuate an "injury release" results in the purported "injury release" being void, voidable,  and unenforceable.

70.    The alleged "injury release" is the result of compulsion and duress on Amber, is in contravention of law in general, violates and is against public policy.  As a result of State Farm failing to offer a fair settlement on her first party collision claim Amber has been damaged. She has $8,227 to $16,346 in uncompensated tort damages. Amber was not paid her first party collision coverage in the amount of $4,875.79. Amber is also out of pocket $380.31 for payment she had to pay to sufficiently repair her leased Subaru.

## COUNT IV

71.    The purported "injury release" does not mention Amber's first party and third-party claims against State Farm and there is no contract to release those claims.

72.    KRS 304.12–230(3) requires State Farm to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.

73.    State Farm made no investigation into Amber's injuries and tort claims, and State Farm did not request or review any medical records, treatment records or any other documents before its alleged offer or subsequent denial of Amber claims. State

Farm failed to adopt **and** implement reasonable standards for the prompt investigation of claims arising under Amber's insurance policy and the policy that provided coverage to Defendant Weir in violation of KRS 304.12-230(3).

74.    State Farm is obligated to pay the vehicle property damage claims under both the first party collision coverage policy language and third-party liability coverage and pay for parts sufficient to restore the Subaru to its pre-loss condition, and compensate Amber under Defendant Weir's coverage for her tort claims. 806 KAR 12:095(6) and (8).

75.    State Farm did not have a reasonable basis to refuse parts sufficient to restore the leased Subaru to its pre-loss condition under her first-party collision coverage policy language or under the third-party liability coverage.

76.    State Farm intentionally or with reckless disregard of Amber's rights refused to pay for parts sufficient to restore the Subaru to its pre-loss condition to leverage an "injury release" of tort claims in an effort to minimize payment of tort claims, knowing there was no basis in the law or fact for its strategy and tactics.

77.    KRS 304.12-230(6) requires State Farm to attempt in good faith to effectuate prompt, **fair and equitable** settlements of Amber's claims in which liability became reasonably clear.

78.     State Farm made no investigation of Amber's injuries, whether or not she was injured, if she had sought medical treatment, if she would seek medical treatment, if she incurred lost wages, if she would incur lost wages, or if she was in pain, or if she suffered mental anguish or inconvenience. State Farm did not request or review any medical records, treatment records or any other documents before its alleged $1,000 offer for pain and suffering, but stated it was to make up for State Farm's alleged inability to pay for parts sufficient to restore the leased Subaru to its pre-loss condition. State Farm intentionally or with reckless disregard of Amber's rights failed to attempt in good faith to effectuate a fair and equitable settlement with Amber under her first party collision coverage or under Weir's third-party liability coverage, in violation of KRS 304.12-230(6).

79.     State Farm is contractually obligated to pay for the repair of the car under Amber's first party collision coverage policy language and Weir's third-party liability coverage including parts sufficient to restore the leased Subaru to its pre-loss condition, and additionally, not exclusively compensate Amber under Defendant Weir's liability coverage for her tort claims.

80.     State Farm did not have a reasonable basis to only offer $1,000 for pain and suffering, if that is what State Farm did, and deny Amber's other claims. Amber incurred $8,227 to $16,346 in uncompensated tort damages. Amber was also not paid

her first party collision coverage in the amount of $4,875.79.  Instead she is of pocket

$380.31 for payments she had to make to sufficiently repair her leased Subaru to pre-

loss condition.

81.    State Farm intentionally or with reckless disregard of Amber's rights

refused to pay for parts sufficient to restore the Subaru to its pre-loss condition in order

to obtain a release of pain and suffering claims in an effort to minimize payment of tort

claims and knew there was no basis in the law or fact for State Farm's strategy and

tactics.

82.    KRS 304.12-230(13) prohibits State Farm from failing to promptly settle

claims where liability was reasonably clear, under one portion of the insurance policy

coverage in order to influence settlements under other portions of the insurance policy

coverage.

83.    State Farm made no investigation into Amber's injuries, whether or not

she was injured, if she had sought medical treatment, if she would seek medical

treatment, if she incurred lost wages, if she would incur lost wages, or if she was in pain

or if she had mental anguish or suffered inconvenience.  State Farm did not request or

review any medical records, treatment records or any other documents before its

alleged offer of $1,000 for pain and suffering, but leveraged its refusal to pay for parts

sufficient to restore the leased Subaru to its pre-loss condition under the first party

collision coverage and property damage liability coverage.  State Farm intentionally or with reckless disregard for her rights violated its contract with Amber to attempt an oral release of tort claims in an effort to minimize payment of tort claims and knew there was no basis in the law or fact for the refusal, in violation of KRS 304.12-230(13).  The alleged transcript of the purported "injury release" does not discuss past or future medical expenses, future pain-and-suffering, inconvenience, lost wages, mental anguish, permanent injury and impairment of the power turn money, all of which are tort damages available under the KRS 304.39-010, and 060.

84.    State Farm is obligated to pay to repair the car under both the first party collision coverage and third-party liability coverage and pay for parts sufficient to restore the leased Subaru to its pre-loss condition and compensate Amber under Defendant Weir's liability coverage for her tort claims.

85.    State Farm violated KRS 304.12-230(13) by attempting to leverage an oral release of third-party tort claims by violating its contract with Amber for first party collision coverage or third-party property damage liability coverage on Weir.  State Farm failed to promptly settle Amber's first party collision claim to obtain an oral release of the tort claims against State Farm's other insured, Defendant Weir in violation of KRS 304.12-230(13).  As a result of State Farm's conduct Amber never got a first party collision claim settlement, and Amber has suffered a loss of $8,227 to $16,346 in

uncompensated tort damages.  Amber was not paid her first party collision coverage in the amount of $4,875.79 and Amber ended up out of pocket $380.31 for payments she had to make to sufficiently repair her leased Subaru to pre-loss condition.

86.    KRS 304.12-0230(14) requires State Farm to promptly provide Amber with a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

87.    State Farm intentionally or with reckless disregard for Amber's rights did not explain to Amber the basis in her insurance policy for its refusal to pay for parts sufficient to restore the leased Subaru to its pre-loss condition under the first party collision coverage. State Farm did this to leverage Amber's tort claims and cost Amber $8,227 to $16,346 in uncompensated tort damages and $4,875.79 in contractually owed collision damages.

88.    State Farm did not provide Amber with a reasonable explanation as to why her first party collision claim was never paid, and a third-party liability claim was opened and a new claim number was given because State Farm knew it was violating KRS 304.12-230, its policy of insurance with Amber, and the common law requirement to deal with its insured, Amber with the utmost good faith.

89.    State Farm withheld a reasonable explanation from Amber as to why State Farm's first party collision adjuster could not act as the third-party liability adjuster

because of the conflict which also violates State Farm's duty to excise the utmost good faith in its dealings with Amber.

90.    State Farm did not provide Amber with a reasonable explanation as to why offers were made so as to effectuate State Farm's purpose of leveraging getting a release of third-party tort claims by making offers that did not cover the cost of parts sufficient to restore the leased Subaru to its pre-loss condition, under first party collision coverage or third party property damage liability coverage, in violation of KRS 304.12-230 and the contract of insurance between State Farm and Amber.

91.    State Farm knew there was no reasonable basis to offer $1,000 to resolve Amber's pain and suffering claim and to refuse to pay for parts sufficient to restore the Subaru to its pre-loss condition and still proceeded to act with reckless disregard in its dealings with its insured, Amber Rasmussen.

92.    KRS 304.12-230(1) prohibits State Farm from misrepresenting pertinent facts and insurance policy provisions relating to the coverages at issue.

93.    Amber learned that particular parts were required to repair the leased Subaru and  State Farm refused to pay for those parts after she told State Farm of her leased Subaru's parts requirements.

94.    State Farm told Amber that her first party collision coverage did not require State Farm to pay for the parts required by Amber's lease.

95.    State Farm's insurance policy with Amber provides coverage as follows: "The (State Farm's)  estimate will include parts sufficient to restore the *covered vehicle* to its pre-loss condition."  p. 33 of Amber's policy attached as Exhibit 20.

96.    State Farm misrepresented pertinent facts and insurance coverage to Amber in violation of KRS 34.12-230(1), and did so intentionally or with reckless disregard of her rights, to place her under duress because her car was damaged and not drivable, then leveraged what State Farm calls an oral release which cost her $8,227 to $16,346 in uncompensated tort damages and $4,875.79 on her first party collision claim.

97.    KRS 304.12-230(4) prohibits State Farm from refusing to pay claims without conducting reasonable investigations based upon all available information.

98.    The alleged transcript of the "injury release" allegedly obtained by State Farm on behalf of Defendant Weir does not discuss or release Amber's 1) first-party collision claim against State Farm, 2) claims for past or future medical expenses, 3) claims for all pain and suffering including future pain and suffering, 4) claims for past and future mental anguish, 5) claims for inconvenience, 6) claims for permanent injuries and impairment of her power to labor and earn money, 7) claims for past lost wages, 8) or third-party property damage claims, including claims for the diminished value of the vehicle and loss of use.

99.    A demand packet was sent to State Farm with accompanying medical records, bills, and other supporting documentation on July 26, 2019. State Farm denied the demand based upon its alleged transcript of the purported oral "injury release" even though the purported oral "injury release", even if found to be valid, did not release any of the claims enumerated above. State Farm's actions violate KRS 304.12-230(4).

100.    Bachman Subaru advised State Farm in its estimate which parts were needed to restore the leased Subaru to its pre-loss condition in accordance with the lease with Amber. Amber thinks State Farm discussed this issue with Bachman, and even with the information available to it, State Farm continued to refuse to pay for parts sufficient to restore the Subaru to its pre-loss condition in violation of its contract with Amber and KRS 304.39-230(4).

101.    State Farm's willful and reckless disregard for the requirements of KRS 304.12-230(4) cost Amber $8,227 to $16,346 in uncompensated tort damages and $4,875.79 in contractually owed collision damages, in addition to other damages sought in the complaint and amended complaint.

102.    KRS 304.12-230(7) prohibits State Farm from compelling Amber to institute litigation to recover amounts due under Amber's first party collision coverage and Defendant Weir's liability policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds.

103.    The alleged transcript of the "injury release" allegedly obtained by State Farm on behalf of Defendant Weir does not discuss or release Amber's 1) first-party collision claim against State Farm, 2) claims for past or future medical expenses, 3) claims for future pain and suffering, 4) claims for past and future mental anguish, 5) claims for inconvenience, 6) claims for permanent injury and the impairment of the power to labor and earn money, 7) claims for past lost wages, 8) or third-party property damage claims, including claims for the diminished value of the vehicle and loss of use.

104.    A demand packet was sent to State Farm with accompanying medical records, bills, and other supporting documentation on July 26, 2019.  State Farm denied the demand based upon its alleged transcript of a purported oral "injury release" even though the purported oral "injury release", even if found to be valid, did not release any of the claims enumerated above.  State Farm is obligated to pay the claims against its insured Defendant Weir.

105.    State Farm was also furnished with documentation and estimates documenting the parts needed to restore the Subaru to its pre-loss condition.  State Farm was obligated by its contract with Amber to pay the collision claim.

106.    The estimated range of a raw jury verdict for Amber's tort claims is $18,454 to $26,573.  State Farm states Amber is only owed $1,000.00 based upon the alleged transcript of the purported oral "injury release".  State Farm has compelled

Amber to institute this litigation to obtain $8,227 to $16,346 in uncompensated tort damages and $4,875.79 in contractually owed collision damages.

107.    State Farm lacks a reasonable basis to deny the claims and acted with reckless disregard for whether such claims existed compelling Amber to institute this litigation.  State Farm's actions violate KRS 304.12-230(7).

108.    KRS 304.12-230(10) prohibits State Farm from making claims payments not accompanied by a statement setting forth the coverage under which the payments were being made.

109.    The $1,000.00 check State Farm mailed to Amber was not accompanied by the required statement setting forth the coverage under which the payment was being made.

110.    State Farm intentionally or with reckless disregard for Amber's rights withheld information setting forth the coverage under which the $1,000 check was issued to Amber in an attempt to extract a "day after accident" release.

111.    State Farm lacked a reasonable basis in the law or fact for not providing a statement setting forth the coverage under which the $1,000 check was issued to Amber and issued the check without an accompanying statement knowing an accompanying statement was required and reckless disregard for its insured Amber's right to be

informed under which coverage the payment was being issued.  State Farm's actions constitute a violation of KRS 304.12-230(10).

## COUNT V

112.    Amber's first party collision claim arose under her contract of insurance with State Farm.

113.    Her first party collision coverage in her contract with State Farm requires State Farm to pay for "parts sufficient to restore the *covered vehicle* to its pre-loss condition." p. 33 of State Farm policy attached as Exhibit 20.

114.    Amber made a collision claim under her contract of insurance with State Farm.

115.    State Farm violated its policy with Amber and refused to pay for parts sufficient to restore the Subaru to its pre-loss condition.

116.    More than thirty (30) days passed from when Amber put State Farm on notice of her first party collision claim.

117.    State Farm has not paid out any benefits under Amber's first party collision coverage for the collision of October 22, 2018 yet.  KRS 304.12-235.

118.    State Farm refused to make a good faith attempt to resolve the first party collision claim in an attempt to get a release of Amber's tort claims against Defendant Weir which has resulted in Amber incurring $8,227 to $16,346 in uncompensated tort

damages, in addition to the other damages described in the complaint and this amended complaint.

119.    Pursuant to KRS 304.12-235(2) and (3), State Farm bears twelve percent (12%) interest per annum and reasonable attorney fees on the unpaid tort claims in the amount of $8,227 to $16,346 and the unpaid collision coverage in the amount of $4,875.79.

### COUNT VI

120.    Amber paid over $1,800 per year for her State Farm Policy, of which over $500 per year was for collision coverage.

121.    The first page of Amber's policy renewal documents sent to her by State Farm contains the following. Amber relied on this representation and State Farm's good neighbor advertising to as reason to buy the expensive state Farm coverage.



122.    The "purchase of an insurance policy is a purchase of a 'service' intended to be covered by the Consumer Protection Act." Stevens v. Motorist Mut. Ins. Co., 759 S.W.2d 819, 820 (Ky. 1988).

123.    When it sold the first party collision coverage to Amber, State Farm was aware that the coverage was being provided on the Subaru Amber was leasing, was aware of the lease requirements, and the requirements should the leased vehicle need to be repaired.

124.    With the above knowledge State Farm sold Amber Rasmussen first party collision coverage for the leased Subaru.

125.    State Farm sold Amber the policy then took the position that it would not pay for parts sufficient to restore the leased Subaru to its pre-loss condition despite representing to her "Life's more about insurance. So are we. We'll always be there with protection if something goes wrong, but we're also here to help life go right." Policy renewal attached as Exhibit 2.

126.    When State Farm misled Amber on the collision coverage and attempted a quick settlement of tort claims by refusing to pay in accordance with the insurance contract it cost Amber $8,227 to $16,346 in uncompensated tort damages and

$4,875.79 in unpaid collision damages, in addition to the other damages described in the complaint and this amended complaint.

127.    State Farm's conduct toward Amber, and others similarly situated, was unfair, false, misleading and deceptive and in violation of KRS 367.170, also known as the Kentucky Consumer Protection Act.

## COUNT VII

128.    Amber paid over $1,800 per year for her State Farm Policy, of which over $500/year was for collision coverage.

129.    State Farm accepted the payments from Amber Rasmussen for the first party collision coverage.

130.    State Farm refused to pay the first party collision coverage claim and has been unjustly enriched by its inequitable retention of the insurance benefits and premiums at the expense of Plaintiff Rasmussen.

## COUNT VIII

131.    If the alleged "injury release" is found to be valid, enforceable and to pertain to Amber's tort claims, not just pain and suffering as of October 24, 2018, a benefit of not having to pay additional money has been conferred upon Defendants Weir and State Farm.

132.    Defendant Weir also appreciates the benefit of not having the risk of an excess judgment being entered against her.

133.    State Farm appreciates the benefit of paying less money under the third-party liability coverage than Amber's claim is reasonably worth.

134.    The estimated range of a raw jury verdict for Amber's tort claims is $18,454 to $26,573.  See report from Shannon Ragland, founder of Kentucky Trial Court Review attached as Exhibit 11. This means that Amber has $8,227 to $16,346 in uncompensated tort damages.

135.    Neither Defendant Weir nor Defendant State Farm have made full payment for the value of the benefit they received and therefore both are unjustly enriched.

## COUNT IX

136.    On June 5, 2018 on Bardstown Road in Jefferson County Kentucky, Deborah Combs negligently and carelessly operated an automobile so as to cause it to collide with the automobile owned and operated by Betty Irvin.

137.    As a result of the negligence and carelessness of Deborah Combs, Betty Irvin has been caused to incur medical expenses in excess of $26,000.00, and she will be caused to incur medical expenses in the future.  Betty Irvin is permanently injured and her power to labor and earn money is permanently impaired.  Betty Irvin has endured

physical and mental pain and suffering and mental anguish and inconvenience as a result of the collision, and she will be caused to endure physical and mental pain-and-suffering and mental anguish and inconvenience in the future as a result of the collision.

### COUNT X

138.    As a result of the negligence and carelessness of Deborah Combs, Betty Irvin's automobile was a total loss causing her to also have a property damage claim and a loss of use claim.

### COUNT XI

139.    Plaintiff Betty Irvin prays for a declaratory judgment pursuant to 28 U.S.C. §2201(a), the Declaratory Judgment Act, that her KRS 304.39-060 tort claims, including medical expenses, pain-and-suffering, lost wages, mental anguish, inconvenience, permanent injury and impairment of her power to labor and earn money, against Defendant Combs are not released, and there is no release contract or accord and satisfaction of those claims.

140.    An oral release or settlement is a type of contract, subject to all defenses to a contract.

141.    Betty is hearing impaired. Betty did not hear State Farm or understand State Farm so as to have a meeting of the minds, mutual assent, offer,  acceptance, consideration, mutuality of obligation, intent, or agreement to orally release her KRS

304.39–060 statutory tort claims against Defendant Combs. There is no writing to evidence such an agreement, and Betty never signed any such agreement.

142.    There is no "release" contract because the required elements of contract formation are missing.  Betty is hearing impaired and could not and did not hear all that was said in any conversation about any purported "release". Betty would not have entered into such a contract and believes State Farm preyed upon her as an elderly widow who was under duress as a result of her injuries and the loss of her car.

143.    Any purported settlement agreement with Defendant Combs was promulgated by Defendant Comb's agent, State Farm, through means that violated KRS 304.12-230, The Unfair Claims Settlement Practices Act, and is therefore void or voidable as against public policy and the law.

144.    "'[D]ay after the accident' settlements are not looked upon with favor by the courts." McGregor v. Mills, 280 S.W.2d 161, 162 (Ky.App. 1955); See also Topass v. Perkins' Adm'x, 104 S.W.2d 423, 431 (Ky.App. 1937).  Any purported "release" Betty purported entered into the morning after the collision is void as contrary to public policy. Betty heard State Farm say that the $1,530 was for her inconvenience due to her car being a total loss.  State Farm has refused or is unable to produce any audio or transcripts of the entirety of Betty's conversation with State Farm, despite proper requests.

145.    Oral settlements are only enforceable if the requirements of a contract are meant, which includes the requirement of "full and complete terms."  Cantrell Supply, Inc. v. Liberty Mut. Ins. Co., 94 S.W.3d 381, 384 (Ky.App. 2014).

146.    Betty's purported release of claims does not contain full and complete terms.  The purported oral release does not state that claims for pain and suffering, future pain and suffering, future medical expenses, future lost wages, future and past mental anguish, future or past inconvenience, permanent injury, destruction of the power to labor and earn money, or injuries which have resulted or may result in the future are released.  The purported oral release also does not release claims against State Farm for any reason including third-party bad faith.  An exemplar written State Farm release is attached as Exhibit 19 which shows what State Farm has demanded as full and complete terms before it launched its quick settlement scheme.

147.    The purported release of claims against Defendant Combs also lacks the formal requisites of a contract in general, in particular the missing elements of: Plaintiff's  signature, mutual assent, mutuality of obligation,  undue influence exerted upon Plaintiff, lack of intent of the parties, lack of an offer and acceptance in general, lack of consideration, and failure of consideration.  Betty cannot agree to what she cannot hear.

148.    State Farm's failure to act in good faith while attempting to effectuate an oral release results in the purported Release being void, voidable,  and unenforceable.

149.    The alleged "release" is the result of compulsion on Betty because State Farm withheld the total loss payment for Betty's vehicle in an attempt to obtain a "release" of Betty's tort claims, and is in contravention of law in general, violates and is against public policy.  State Farm knew Betty's car was a total loss and that she was leaving on vacation with her family in two days and withheld the total loss payment.

150.    Betty cashing the check for $1,530.00 does not release her tort claims. Kentucky law prohibits an insurance company check from acting as a release. And, any condition stated on the check does not affect the right of Betty to enforce the check. KRS 355.3-206 and KRS 304.20-070.

## COUNT XII

151.    The purported oral "release" does not mention Betty's third-party claims against State Farm and there is no contract that releases those claims.

152.    KRS 304. 12 – 230(3) requires State Farm to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.

153.    State Farm made no investigation into Betty's injuries. Betty went to the hospital the day the wreck. State Farm did not investigate whether or not she was

injured, if she had sought medical treatment, if she would seek further medical treatment, if she incurred lost wages, if she would incur lost wages, or if she was in pain or suffered mental anguish or inconvenience, or if she was on Medicare. State Farm did not request or review any medical records, treatment records or any other documents before offering Betty $1,530. State Farm failed to adopt **and** implement reasonable standards for the prompt investigation of claims arising under the insurance policy in violation of KRS 304.12-230(3). This resulted in Betty suffering $42,292 to $65,366 in uncompensated tort damages

154.    State Farm was obligated to pay the property damage claims and to compensate Betty under Defendant Combs' coverage for her tort claims.

155.    State Farm did not have a reasonable basis to withhold the total vehicle loss payment under the third-party liability coverage.

156.    State Farm intentionally or with the reckless disregard of Betty's rights refused to pay the total loss of the car claim in an attempt to obtain the purported day after collision oral "release" of Betty's tort claims in an effort to minimize payment of her tort claims, knowing there was no basis in the law or fact for the refusal.

157.    KRS 304.12-230(6) requires State Farm to attempt in good faith to effectuate prompt, **fair and equitable** settlements of Betty's claims in which liability became reasonably clear.

158.    State Farm did not request or review any medical records, treatment records or any other documents before offering Betty $1,530. State Farm did not attempt in good faith to effectuate a fair and equitable settlement with Betty in violation of KRS 304.12-230(6).    This resulted in Betty suffering $42,292 to $65,366 in uncompensated tort damages, in addition to the other damages assert in the complaint and this amended complaint.

159.    State Farm is obligated to pay Betty for her KRS 304.39–060 tort claims under Defendant Combs' liability coverage.

160.    State Farm did not have a reasonable basis for its offer of $1,530, whatever that amount was for, or to issue a check for that amount when Betty's hospital bill for the day of her injury, and related charges, totaled near $7,000.

161.    State Farm intentionally or with reckless disregard for Betty's rights refused to immediately agree to pay Betty's total loss property damage claim in order to obtain an oral release of "bodily injury" claims in an effort to minimize payment of tort claims, and knew there was no basis in the law or fact for its conduct. This resulted in Betty suffering $42,292 to $65,366 in uncompensated KRS 304.39–060 tort damages, in addition to the other damages described in the complaint and amended complaint.

162.    KRS 304.12-230(13) prohibits State Farm from failing to promptly settle claims where liability was reasonably clear, under one portion of the insurance policy

coverage in order to influence settlements under other portions of the insurance policy coverage.

163.    State Farm made no inquiry into Betty's injuries, whether or not she was injured, if she had sought medical treatment, if she would seek additional medical treatment, if she incurred lost wages, if she would incur future lost wages, or if she was in pain or suffered mental anguish or inconvenience.  State Farm did not request or review any medical records, or any other documents before sending Betty a check for $1,530. State Farm intentionally or with a reckless disregard for Betty's rights attempted to obtain a "release" of Betty's tort claims in an effort to minimize payment of tort claims and knew there was no basis in the law or fact for its conduct, in violation of KRS 304.12-230(13).  This cost Betty $42,292 to $65,366 in uncompensated tort damages, in addition to the other damages asserted in the complaint and this amended complaint. The alleged transcript of the purported oral "release" does not discuss past or future medical expenses, inconvenience, lost wages, mental anguish, permanent injury and other tort damages available under the KRS 304.39-060, *et seq*., so if an oral settlement exists it cannot release those items of damage.

164.    State Farm was obligated because of the clear liability of the collision to pay Betty's property damage claims under Combs' third-party liability coverage and also pay Betty under Combs' liability coverage for Betty's tort claims.

165.    Per KRS 304.12-230(13) State Farm is prohibited and may not leverage a release of third-party tort claims or withhold payment on a third-party total loss property damage liability claim.

166.    KRS 304.12-0230(14) requires State Farm to promptly provide Betty with a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim **or for the offer** of a compromise settlement.

167.    State Farm intentionally or with a reckless disregard for Betty's rights did not provide any explanation to Betty at any time for its payment of $1530.

168.    If State Farm had attempted to explain to Betty the basis in the insurance policy for its refusal to immediately pay the total loss property damage claim, and the true nature its offer of $1,530 Betty would have rejected any such payment. State Farm's failure in this regard cost Betty $42,292 to $65,366 in uncompensated tort damages, in addition to the other damages asserted in the complaint and this amended complaint.

169.    State Farm did not provide Betty with a reasonable explanation as to its offer or payment to facilitate State Farm's purpose of leveraging, and to attempt to quickly settle all of her tort claims. State Farm is prohibited from obtaining a release of third-party tort claims by making quick, unfair, inequitable, and delayed offers under third party property damage liability coverage.

170.    State Farm knew or should have known there was no reasonable basis to offer $1,530 to orally settle Betty's "bodily injury" claim and still proceeded to act with reckless disregard in its dealings with Betty.

171.    KRS 304.12-230(4) prohibits State Farm from refusing to pay claims without conducting reasonable investigations based upon all available information.

172.    The alleged transcript of the purported oral "release" does not discuss or release Betty's 1) claims for medical expenses after June 6, 2018, 2) past or future pain and suffering, 3) past and future mental anguish, 4) inconvenience, 5) permanent injury and impairment of her power to labor and earn money, 6) lost wages after June 6, 2018.

173.    A demand packet was sent to State Farm with accompanying medical records, bills, and other supporting documentation on October 31, 2019.  State Farm denied the demand based upon its alleged transcript of a purported oral "release" even though the purported "release", even if found to be valid, did not release any of the claims enumerated above.  State Farm's actions violate KRS 304.12-230(4).

174.    State Farm's willful and reckless disregard for the requirements of KRS 304.12-230(4) has cost Betty $42,292 to $65,366 in uncompensated tort damages, in addition to the other damages assert in the complaint and this amended complaint.

175.    KRS 304.12-230(7) prohibits State Farm from compelling Betty to institute litigation to recover amounts due to Betty under Defendant Combs' liability policy by

offering substantially less than the amounts ultimately recovered in actions brought by such insureds.

176.    The alleged transcript of the purported oral "release does not discuss or release Betty's 1) claims for medical expenses after June 6, 2018, 2) claims for past or future pain and suffering , 3) claims for past and future mental anguish, 4) claims for inconvenience, 5) claims for permanent injury and her power to labor and earn money, 6) claims for lost wages after June 6, 2018.

177.    A demand packet was sent to State Farm with accompanying medical records, bills, and other supporting documentation on October 31, 2019.  State Farm denied the demand based upon its alleged transcript of a purported oral "release" even though the purported oral "release", even if found to be valid, did not release or discuss any of the claims enumerated above.  State Farm is obligated to pay these claims against its insured Defendant Combs.

178.    The estimated range of a raw jury verdict for Betty's tort claims is $53,822 to $76,896.  State Farm only paid Betty $1,530 for its purported oral "release" of all claims against Defendant Combs.  State Farm has compelled Betty to institute this litigation to collect the $42,292 to $65,366 in uncompensated tort damages.

179.    State Farm lacks a reasonable basis to deny the claims and acted with reckless disregard for whether such claims existed compelling Betty to institute this litigation.  State Farm's actions violate KRS 304.12-230(7).

180.    KRS 304.12-230(10) prohibits State Farm from making claims payments not accompanied by a statement setting forth the coverage under which the payments were being made.

181.    The $1,530.00 check State Farm mailed to Betty was not accompanied by any type of statement setting forth the coverage under which the payment was being made.

182.    State Farm intentionally or with reckless disregard for Betty's rights withheld information setting forth the coverage under which the $1,530.00 check was issued to Betty in an attempt to obtain an oral "day after accident" release.

183.    State Farm lacked a reasonable basis in the law or fact for not providing a statement setting forth the coverage under which the $1,530.00 check was issued to Betty and issued the check without an accompanying statement knowing an accompanying statement was required, and reckless disregard for Betty's right to be informed under which coverage the payment was being issued.  State Farm's actions constitute a violation of KRS 304.12-230(10).

**COUNT XIII**

Page **46** of **56**

184.    If the purported oral "release" is deemed to be a valid and enforceable contract then it creates privity between State Farm and Betty Irvin.

185.    State Farm's actions of attempting to and/or obtaining a valid, enforceable oral release of claims, over the phone, from an elderly woman with hearing impairment by stating the payment was for "inconvenience", insinuating it was for "inconvenience" relating to Betty's vehicle being a total loss, is unfair, false, misleading, and deceptive conduct and in violation of KRS 367.170, also known as the Kentucky Consumer Protection Act.

186.    State Farm's conduct toward others similarly situated to Betty is unfair, false, misleading and deceptive and in violation of KRS 367.170, also known as the Kentucky Consumer Protection Act.

## COUNT XIV

187.    At the time of the collision Betty Irvin was a Medicare beneficiary and had in full force and effect a Medicare Advantage Plan through Humana.

188.    Under the Medicare Secondary Payor Act State Farm is considered a primary payer and the Medicare Advantage Plan is a secondary payer.

189.    The Medicare Advantage Plan paid some of Betty Irvin's medical expenses for treatment related to the collision described above.  Humana paid less for Betty's medical treatment than Betty would have been paid by the primary payer State Farm

which resulted in Betty not recovering the full amount of the billed charge from the primary payor, which she is entitled to do under Kentucky law.

190.    Betty Irvin is entitled to collect the full amount of her billed medical expenses, less the amount paid or payable by PIP, from State Farm, the primary payer. The Humana Medicare Advantage Plan pays at a reduced contractual rate. This has caused Betty Irvin personal financial loss.

191.    In addition, Betty Irvin has incurred co-pays which resulted in personal financial loss.

192.    42 U.S.C. §1395y(b)(3)(A) of the Medicare Secondary Payor Act creates a private right of action with double recovery against primary payers who fail to provide the appropriate payment or reimbursement.

193.    State Farm, the primary payer, has failed to provide the appropriate reimbursement for Betty's medical expenses caused by collision, and has instead shifted the burden of payment to the secondary payer, Humana Medicare Advantage.

194.    Betty has standing and asserts a claim against State Farm pursuant to 42 U.S.C. §1395y(b)(3)(A) for double damages, and the financial loss she has incurred as a result of State Farm's actions as primary payer. The 6th Circuit has recognized that individuals such as Betty Irvin have the right to assert such a private cause of action.

<u>Gucwa v. Lawley</u>, 731 Fed.Appx. 408 (6th Cir. 2018) and <u>Duncan v. Liberty Mutual</u>

<u>Insurance Company</u>, 745 Fed.Appx 575 (6th.Cir. 2018).

### COUNT XV

195.    The Plaintiffs bring this class action pursuant to Civil Rule 23 of the

Kentucky Rules of Civil Procedure on behalf of a class consisting of all tort claimants

within and limited to the Commonwealth of Kentucky who made property damage

claims against State Farm which resulted in a concomitant oral settlement or release of

tort claims for medical expenses, lost wages, past and future pain-and-suffering, mental

anguish, inconvenience, permanent injury, and impairment of the power to labor and

earn money and for tort claimants who are Medicare beneficiaries who suffered

financial loss as a result of State Farm as primary payor refusing payment, shifting the

burden of payment to Medicare and/or a Medicare Advantage plan, which in turn

caused financial loss for the injured claimant.

196.    State Farm has stipulated numerosity in its Notice of Removal. (Document

1 p. 6 ¶21).

197.    Plaintiffs will fairly and adequately represent and protect the interests of

the other members of the class.  Plaintiffs have retained competent counsel experienced

in complex and class action litigation.  Plaintiffs' counsel has agreed to advance the

necessary costs of this class action litigation.  Plaintiffs understand that they have an

obligation to prosecute this action in the best interest of the class and intend to do so vigorously.

198.    Plaintiffs' claims are typical of the claims of the other members of the class because all class members' claims arise from State Farm's efforts to extract from tort claimants who make property damage claims oral settlements or oral releases of their KRS 304.39–060 tort claims for medical expenses, lost wages, past and future pain-and-suffering, mental anguish, permanent injury, inconvenience and impairment of the power to labor and earn money.

199.    Betty's claims pursuant to 42 U.S.C. §1395y(b)(3)(A) are typical of the other members of the class who are Medicare and/or Medicare Advantage plan beneficiaries in that the class members' claims arise from State Farm, the primary payer's, failure to provide the appropriate reimbursement for class members' medical expenses related to a collision and has instead shifted the burden of payment to the secondary payer, Medicare and/or a Medicare Advantage plan resulting in the class members' suffering financial loss through the personal payment of co-pays, deductibles and medical payments and not obtaining the full amount of the billed charges from State Farm, the primary payor.

200.    Plaintiffs do not have interests antagonistic to or in direct conflict with other members of the class.

201.    Plaintiffs and each member of the class have the same interest in pursuing tort claims for medical expenses, lost wages, past and future pain-and-suffering, mental anguish, permanent injury, inconvenience and impairment of the power to labor and earn money.

202.    Class members who have claims pursuant to  42 U.S.C. §1395y(b)(3)(A) have the same interest in pursuing double damages and claims for financial loss suffered by the class members as a result of State Farm's actions.

203.    Common questions of law and fact exist as to all members of the class and predominate over any questions effecting solely individual members of the class.

204.    State Farm has acted on grounds generally applicable to the class by violating KRS 304.12–230 and the Kentucky Consumer Protection Act.  Class treatment is therefore appropriate for the relief sought herein.

205.    A class action is superior to other available methods for the fair, efficient adjudication of this controversy.

206.    Plaintiffs are not aware of any other litigation initiated by any other member of this class either as an individual action or as a class action.  Plaintiffs are not aware of any interest by any member of the class individually prosecuting or controlling separate actions.

207.    It is desirable to concentrate this litigation in Kentucky since this Court has personal jurisdiction over the Defendants, two of the substantial Defendants are Kentucky residents, and all class members reside in Kentucky or resided in Kentucky at the time of the purported oral "release".  The Plaintiffs have committed to undertake this litigation on behalf of the class and are unaware of any other jurisdiction that has any litigation related to this action now pending.

208.    No unusual difficulty will be encountered in the management of this action that would preclude its maintenance as a class action.  The predominant liability issues that will establish the basis for relief are: the inadequacy of any purported oral release or oral settlement agreement to release all tort claims allowed by KRS 304.39–060 but not articulated in the purported oral release; Kentucky eschews quick settlements and State Farm's quick oral release strategy confounds the purpose of the Motor Vehicle Reparations Act; and, State Farm's violations of KRS 304.12–230 and 235, the Kentucky Consumer Protection Act, and 42 U.S.C. §1395y(b)(3)(A). State Farm's computer data bases and records will enable the parties to identify and locate the class members, and to fashion relief to the class on class wide and individual bases.  Notice can be provided to class members by a combination of first-class mail using the addresses of the class members maintained in State Farm's data bases and records, and through published

notice using techniques in a form of notice customarily used in class actions.  The notice can and will comply with the requirements of CR 23.03.

WHEREFORE the Plaintiffs demand judgment against the Defendants State Farm Mutual Automobile Insurance Company, Sarah Weir, and Deborah Combs as follows:

1.      Certification of this action as a class action on behalf of a class as defined herein;      Appointment of Amber Rasmussen and Betty Irvin as representatives of the class.  Appointment of Plaintiffs' attorneys as  attorneys for the class;

2.      A permanent injunction prohibiting State Farm from obtaining in the future concomitant oral settlements or releases of property damage  and tort claims for medical expenses, lost wages, past and future pain-and-suffering, mental anguish, permanent injury, inconvenience, and impairment of the power to labor and earn money in violation of KRS 304.12–230 and 235, and the Kentucky Consumer Protection Act.

3.      A declaratory judgment that such alleged oral settlements or releases are void, voidable, and unenforceable as to Plaintiffs and the class.

4.      Compensatory damages for Plaintiffs for their collision, property damage, and tort claims.

5.      Interest at 12% per annum and reasonable attorneys' fees on Amber Rasmussen's first-party collision claims against State Farm, and all other class members similarly situated pursuant to KRS 304.12-235.

6.      Double damages pursuant to 42 U.S.C. §1395y(b)(3)(A) for Betty Irvin, and all other class member similarly situated for financial loss incurred.

7.      Punitive damages from State Farm for its bad faith conduct, violations of KRS 304.12-230 and violations of the Kentucky Consumer Protection Act for Betty Irvin, Amber Rasmussen, and all class members;

8.      Attorney's fees;

9.      Costs herein incurred;

10.     Trial by jury; and

11.     Any and all other relief to which the Plaintiffs and class may appear to be entitled.

Respectfully submitted,

RICHARD BREEN
LAW OFFICES, P.S.C.

___/s/  Richard M. Breen_____
RICHARD M. BREEN
G. ADAM REDDEN
CONNOR M. BREEN
2950 Breckenridge Lane - Suite 3
Louisville, Kentucky 40220
(502) 473-0579
FAX (502) 451-9144
richard@breen.org
adam@breen.org
connor@breen.org
*Counsel for Plaintiffs*

## CERTIFICATE

I hereby certify that on March 3, 2020, I electronically filed the foregoing with the clerk of the court by using the CM/ECF, which will send notice of electronic filing to all CM/ECF participants.  It is further certified that a true copy hereof was emailed to the following:

David T. Klapheke
BOEHL STOPHER &GRAVES LLP
400 West Market Street, Suite 2300
Louisville, KY 40202
502)  589–5980
dklapheke@bsg-law.com
*Counsel for Defendant State Farm*
*Mutual Automobile Insurance Company*

Amy C. Andrews
Joseph A. Cancila, Jr.
Harnaik (Nick) Kahlon
Riley Safer Holmes & Cancila LLP

70 W. Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8750
aandrews@rshc-law.com
jcancila@rshc-law.com
nkahlon@rshc-law.com
*Counsel for Defendant State Farm*
*Mutual Automobile Insurance Company*

Curt Sitlinger
Sitlinger and Theiler
320 Whittington Pkwy., Suite 304
Louisville, KY 40222-4919
csitlinger@smtlawoffice.com
*Counsel for Defendant Combs*

and mailed to:

Sarah Weir
2124 Sherwood Avenue, Apt. #1
Louisville, Kentucky 40205
*Defendant*

Daniel Cameron, Attorney General
**Office of the Attorney General**
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601-3449

   /s/  Richard M. Breen
RICHARD M. BREEN